Slip Op. 18-65

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| CSC SUGAR LLC,<br><br>                          Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>                          Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 17-00215 |

**OPINION and ORDER**

[Plaintiff's motion to complete the administrative record is granted in part and denied in part.]

Dated: June 1, 2018

 Jeffrey S. Neeley and Michael Klebanov, Husch Blackwell, LLP, of Washington, DC for Plaintiff CSC Sugar LLC.

 Alexander O. Canizares, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC for Defendant United States. With him on the brief was Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Lydia Caprice Pardini, Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

 Robert Charles Cassidy, Jr., Charles S. Levy, James R. Cannon, Jr., Jonathan M. Zielinsky, and Nina R. Tandon, Cassidy Levy Kent (USA) LLP, of Washington, DC for Defendant-Intervenors the American Sugar Coalition, American Sugar Cane League, American Sugarbeet Growers Association, American Sugar Refining, Inc., Florida Sugar Cane League, Rio Grande Valley Sugar Growers, Inc., Sugar Cane Growers Cooperative of Florida, and the United States Beet Sugar Association.

 Rosa S. Jeong and Irwin P. Altschuler, Greenberg Traurig, LLP, of Washington, DC for Defendant-Intervenor Cámara Nacional de Las Industrias Azucarera y Alcoholera.

 Gregory J. Spak, Kristina Zissis, and Ron Kendler, White & Case LLP, of Washington, DC for Defendant-Intervenor Imperial Sugar Company.

Gordon, Judge: Before the court is the motion of Plaintiff CSC Sugar LLC ("Plaintiff" or "CSC Sugar") to complete the administrative record filed by the U.S. Department of Commerce ("Commerce") in this action challenging Commerce's determination to amend the suspension agreement regarding the antidumping duty investigation on <u>Sugar From Mexico</u>. <u>See</u> <u>Sugar from Mexico</u>, 82 Fed. Reg. 31,945, PD 114[1] (Dep't of Commerce July 11, 2017) (amendment to the AD Suspension Agreement) ("AD Amendment"); Pl.'s Mot. to Complete Admin. R., ECF Nos. 32 & 33 ("Pl.'s Mot."); <u>see also</u> Def.'s Resp. to Pl.'s Mot. to Complete Admin. R., ECF No. 46 ("Def.'s Resp."); Def.-Intervenor Cámara Nacional de Las Industrias Azucarera y Alcoholera Resp. Opp. Pl.'s Mot. to Complete Admin R., ECF No. 44 ("Cámara Resp."); Def.-Intervenors American Sugar Coalition, American Sugar Cane League, American Sugarbeet Growers Association, American Sugar Refining, Inc., Florida Sugar Cane League, Rio Grande Valley Sugar Growers, Inc., Sugar Cane Growers Cooperative of Florida, and the United States Beet Sugar Association's Resp. Opp. Pl.'s Mot. to Complete Admin R., ECF No. 45 ("ASC Resp."); Pl.'s Reply in Supp. of Mot. to Complete Admin. R., ECF No. 50 ("Pl.'s Reply"). The court has jurisdiction over this matter pursuant to Section 516A(a)(2)(B)(iv) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iv), and 28 U.S.C. § 1581(c) (2012).[2] For the reasons set forth below,

---

[1] "PD ___" refers to a document contained in the public administrative record, which is found in ECF No. 29-1, unless otherwise noted. "CD ___" refers to a document contained in the confidential administrative record, which is found in ECF No. 29-2, unless otherwise noted.

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

the court grants Plaintiff's Motion to Complete the Administrative Record in part and denies it in part.

## I.  Background

In 2014, after the American Sugar Coalition, and its members (collectively, "ASC"), filed a petition with Commerce and the U.S. International Trade Commission ("ITC"), the agencies conducted an investigation as to whether imports of sugar from Mexico were being sold at less than fair value, and whether such imports were injurious to the U.S. industry. Commerce preliminarily determined that sugar from Mexico was being sold, or likely to be sold, into the United States at less than fair value. See Sugar From Mexico: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 79 Fed. Reg. 65,189 (Dep't of Commerce Nov. 3, 2014). Commerce and the Government of Mexico subsequently signed a suspension agreement. See Sugar From Mexico: Suspension of Antidumping Investigation, 79 Fed. Reg. 78,039 (Dep't of Commerce Dec. 29, 2014) ("AD Suspension Agreement").

In January 2015, Imperial Sugar Company and AmCane Sugar LLC, requested a review by the ITC of the AD Suspension Agreement to determine whether that agreement had completely eliminated the injurious effects of imports of sugar from Mexico. See Sugar from Mexico: Continuation of Antidumping and Countervailing Duty Investigations, 80 Fed. Reg. 25,278, 25,280 (Dep't of Commerce May 4, 2015). Thereafter, the ITC concluded that the AD Suspension Agreement had indeed eliminated completely the injurious effects of imports of sugar from Mexico. Id.

In early 2016, Imperial Sugar, AmCane, and ASC requested that Commerce initiate an administrative review of the AD Suspension Agreement covering the period from December 19, 2014 to December 31, 2014. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 81 Fed. Reg. 6,832, 6,839 & n.9 (Dep't of Commerce Feb. 9, 2016). During the pendency of the administrative review, the United States began direct negotiations with both the Government of Mexico and producers and exporters of sugar from Mexico regarding possible amendment of the AD Suspension Agreement. On March 9, 2017, the U.S. Secretary of Commerce met with his Mexican counterpart to announce "a new round of negotiations regarding the serious issues identified with the functioning of the current [suspension] agreements on sugar from Mexico." Sugar from Mexico: Meeting with Secretary Wilbur Ross, PD 77 (Dep't of Commerce Apr. 4, 2017). Commerce then notified representatives of Mexican producers and exporters of sugar and the Government of Mexico that Commerce intended to terminate the AD Suspension Agreement on June 5, 2017, unless a revised agreement was reached by that date, citing "outstanding issues between the parties." See Letter from Commerce to Juan Cortina Gallardo and Additional Signatories re: termination of AD Suspension Agreement, PD 78 (May 1, 2017).

By mid-June 2017, Commerce and the Government of Mexico had reached agreement on these issues and initialed draft amendments to the AD Suspension Agreement. The draft amendments proposed, among other items, that the definition of "refined sugar" be changed to 99.2 degrees polarity, even though 99.5 degrees polarity had been the definition since the investigation began in 2014. See Pl.'s Mot. at 3–4.

In keeping with the notice and comment requirements of 19 U.S.C. § 1673c(e)(3), Commerce invited interested parties to comment on the draft amendments as well as draft memoranda explaining how the revisions to the AD Suspension Agreement met the relevant statutory requirements. See Def.'s Resp. at 6–7. After considering comments from interested parties, Commerce, on June 30, 2017, signed final amendments to the AD Suspension Agreement. AD Amendment, 82 Fed. Reg. at 31,945. In August 2017, Commerce released final memoranda explaining how the amended agreement met the relevant statutory requirements and addressing individual comments from the parties. See Def.'s Resp. at 7 (citing explanatory memoranda available at PD 119–122). Subsequently, CSC Sugar commenced this action, challenging Commerce's amendment to the AD Suspension Agreement. See Compl., ECF No. 11.[3] Commerce then filed the administrative record that was in turn followed by Plaintiff's motion to complete the record. See Admin. R. Index, ECF No. 29; see also Pl.'s Mot.

---

[3] CSC Sugar also filed a parallel action, Court No. 17-00214, challenging Commerce's amendment to the CVD Suspension Agreement, which is addressed in this Court's decision in Slip Op. 18-64, also issued this date.

## II. Standard of Review

"Where an agency presents a certified copy of the complete administrative record, as was done in this case, 'the court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary.'" Defenders of Wildlife v. Dalton, 24 CIT 1116, 1119 (2000) (quoting Ammex, Inc. v. United States, 23 CIT 549, 555, 62 F. Supp. 2d 1148, 1156 (1999)). To prevail on "a motion to complete the administrative record, 'a party must do more than simply allege that the record is incomplete. Rather, a party must provide the Court with reasonable, non-speculative grounds to believe that materials considered in the decision-making process are not included in the record.'" Id. (quoting Ammex, 23 CIT at 556, 62 F. Supp. 2d at 1156–57).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984), governs judicial review of Commerce's interpretation of the antidumping duty statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (An agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## III. Discussion

CSC Sugar contends that Commerce did not meet its obligation to file a complete administrative record with the court as required by 19 U.S.C. § 1516a(b)(2)(A)(i) and USCIT Rule 73.2(a). See Pl.'s Mot. at 10–11. Specifically, Plaintiff argues that Commerce failed to memorialize and include in the record ex parte communications between Commerce officials and interested parties (including the domestic sugar industry and

representatives of Mexico) as required by 19 U.S.C. § 1677f(a)(3). Id. at 7–11. In support of its contention, Plaintiff relies on a <u>Financial Times</u> article dated May 31, 2017 that specifically reports on phone calls in May 2017 between the U.S. Secretary of Commerce, U.S. sugar industry representatives, and Mexican sugar industry representatives regarding negotiations to amend the AD Suspension Agreement. <u>See</u> Pl.'s Mot. at Ex. 2 ("<u>Financial Times</u> article").

The Government does not dispute that these ex parte calls occurred. <u>See generally</u> Def.'s Resp. Given this, Plaintiff maintains that under the plain language of §§ 1516a(b)(2) and 1677f(a)(3), Commerce failed to provide the court with the requisite complete "copy of all information presented to or obtained by [Commerce] … including … the record of ex parte meetings required to be kept by section 1677f(a)(3)." <u>See</u> 19 U.S.C. § 1516a(b)(2)(A)(i); <u>accord</u> USCIT R. 73.2(a)(1); <u>see also</u> 19 U.S.C. § 1677f(a)(3). In response, the Government contends that Plaintiff's argument is fundamentally flawed because Commerce was not required to maintain records of ex parte meetings that occurred during the course of suspension agreement negotiations. <u>See generally</u> Def.'s Resp. at 11–26. Specifically, the Government maintains that § 1516(b)(2) and § 1677f(a)(3)'s requirements do not apply to negotiations of a suspension agreement or amendments. The Government further argues that suspension agreement proceedings are free from statutory recordkeeping requirements other than the minimal notice and comment requirements required by 19 U.S.C. § 1673c(e), which details the procedures that Commerce is required to follow before suspending an antidumping duty investigation. <u>See</u> <u>id.</u> at 11–22; 19 U.S.C. § 1673c(e).

As a threshold matter, ASC contends that Plaintiff has failed to demonstrate that there is a "reasonable basis" in fact for the court to conclude that the administrative record is incomplete. See ASC Resp. at 8–10. Plaintiff asks that the court take notice of the Financial Times article describing the unrecorded ex parte communications between Commerce and interested parties as the "reasonable basis" justifying its motion to complete the record. See Pl.'s Mot. at 7 n.3 (citing Nippon Steel Corp. v. United States, 24 CIT 1158, 118 F. Supp. 2d 1366 (2000) (taking judicial notice of press reports indicating that there were ex parte meetings absent from the record)). ASC argues that Nippon Steel is distinguishable because "there was no serious dispute the record was incomplete" in that case. ASC Resp. at 9–10 n.6. Given the fact that the Government does not contest that the ex parte communications at issue actually took place,[4] the court disagrees with ASC. Accordingly, the court takes notice of the Financial Times article and finds that there exists a sufficiently reasonable basis to believe the record is incomplete.

Turning to the legal issues presented by CSC Sugar's motion, because Plaintiff's challenge and the Government's defense both hinge on the interpretation of the applicable statutory provisions, the court applies the two-step framework of Chevron. Under step one of Chevron, the court considers whether Congressional intent on the issue is clear. See Chevron, 467 U.S. at 842–43 ("First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress

---

[4] See generally Def.'s Resp. (making no arguments as to the "reasonable basis" for Plaintiff's motion and arguing only that the applicable statutes do not require Commerce to place on the record any ex parte meetings and communications in connection with suspension agreement negotiations).

is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). If the court cannot identify a clear expression of Congressional intent and concludes that the statutory provision is silent or ambiguous as to the contested issue, the court turns to the second prong of <u>Chevron</u> and determines whether Commerce's interpretation of the statute is reasonable. <u>See</u> <u>id.</u> Because §§ 1516a(b)(2), 1677f(a)(3), and 1673c(e) convey clear Congressional intent to require Commerce to maintain a complete record of suspension agreement proceedings and related determinations, step one resolves the issue.

"In order to determine whether a statute clearly shows the intent of Congress in a Chevron step one analysis, [the court] employ[s] traditional tools of statutory construction and examine[s] 'the statute's text, structure, and legislative history, and appl[ies] the relevant canons of interpretation.'" <u>Heino v. Shinseki</u>, 683 F.3d 1372, 1378 (Fed. Cir. 2012) (quoting <u>Delverde, SrL v. United States</u>, 202 F.3d 1360, 1363 (Fed. Cir. 2000)). Three statutory sections are implicated: 19 U.S.C. § 1516a(b)(2)(A)(i), 19 U.S.C. § 1677f(a)(3), and 19 U.S.C. § 1673c(e). Section 1516a(b)(2)(A)(i), which defines the record for review in antidumping duty proceedings, provides:

> (A)  In general
>
>       For the purposes of this subsection, the record, unless otherwise stipulated by the parties, shall consist of—
>
> (i)       a copy of <u>all information presented to or obtained by</u> the Secretary, the administering authority, or the Commission during the course of the administrative proceeding, <u>including</u> all governmental memoranda pertaining to the case and <u>the record of ex parte</u>

> meetings required to be kept by section 1677f(a)(3) of
> this title;

19 U.S.C. § 1516a(b)(2)(A)(i) (emphasis added). The language of this section is clear and

unambiguous. It requires that "all information presented to or obtained by" Commerce in

the course of reaching its determinations be provided to the court for review of challenges

to those determinations. See Kao Hsing Chang Iron & Steel Corp. v. United States, 25 CIT

372, 140 F. Supp. 2d 1379 (2001) (discussing the breadth and scope of recordkeeping

obligations imposed on Commerce under § 1516a(b)(2)(A) in conjunction with

§ 1677f(a)(3)).

        The Government argues that suspension agreement negotiations are exempt from

the requirements of § 1516a(b)(2) because those negotiations are "confidential" in nature.

The Government, unfortunately, fails to cite or discuss 19 U.S.C. § 1516a(b)(2)(B), which

specifically addresses the inclusion of confidential and privileged materials as within the

scope of § 1516a(b)(2). See 19 U.S.C. § 1516a(b)(2)(B) (providing that recordkeeping

requirements of § 1516a(b)(2) do not disturb confidential or privileged status of materials,

but also noting that court may review such material in camera and may exercise discretion

to direct disclosure). Other than the clarification that materials required to be in the record

under § 1516a(b)(2) shall not lose their privileged or confidential status by virtue of their

inclusion in the record, § 1516a(b)(2) provides no limitations on its requirement that the

record include "all information presented to or obtained by" Commerce in the course of

an antidumping duty proceeding. See 19 U.S.C. § 1516a(b)(2). This section does,

however, expressly reference another statutory provision, 19 U.S.C. § 1677f(a)(3), which

requires the memorialization of ex parte meetings.

Section 1677f(a)(3) provides:

> The administering authority ... shall maintain a record of any ex parte meeting between—
>
> (A) interested parties or other persons providing factual information in connection with a proceeding, and
>
> (B) the person charged with making the determination, or any person charged with making a final recommendation to that person, in connection with that proceeding,
>
> if information relating to that proceeding was presented or discussed at such meeting. The record of such an ex parte meeting shall include the identity of the persons present at the meeting, the date, time, and place of the meeting, and a summary of the matters discussed or submitted.   The record of the ex parte meeting shall be included in the record of the proceeding.

19 U.S.C. § 1677f(a)(3); see also Nippon Steel Corp., 24 CIT at ___, 118 F. Supp. 2d at

1373 ("Any memoranda detailing ex parte communications must be a part of the record

for judicial review."). The language of § 1677f(a)(3) is likewise clear and unambiguous:

"any ex parte meeting" that addresses factual information in connection with an

antidumping duty proceeding must be memorialized for the record by Commerce.

19 U.S.C. § 1677f(a)(3). The legislative history of § 1677f(a)(3) confirms the plain reading

of the statutory language. The Senate Report states that the purpose of the section was

to ensure the "maximum availability of information to interested parties" so that "all parties

to the proceeding are more fully aware of the presentation of information" to Commerce.

See S. Rep. 96-249, Trade Agreements Act of 1979, at 100 (July 17, 1979), reprinted in

1979 U.S.C.C.A.N. 381, 486. The legislative history further clarifies that Congress

intended § 1677f(a)(3) to cover meetings that involved the transmittal of confidential

information, and drafted the section to allow the preservation of confidentiality while also

providing a process for interested parties to at least obtain "nonconfidential summaries"

of that information. Id. The legislative history additionally confirms that § 1677f(a)(3) was

enacted to guarantee broad access to information presented to the agency specifically

because the "standard of judicial review of most administrative actions in … antidumping

duty proceedings is one of review on the administrative record." Id.

Although neither § 1516a(b)(2) nor § 1677f(a)(3) contain any exceptions or

differing criteria for various types of proceedings, the Government argues that these

sections must be read in pari materia with 19 U.S.C. § 1673c(e) to limit the proceedings

to which they apply. Section 1673c(e) governs the procedure for Commerce to suspend

an antidumping duty investigation and provides:

> Before an investigation may be suspended under subsection
> (b) or (c) the administering authority shall—
>
> (1)   notify the petitioner of, and consult with the petitioner
> concerning, its intention to suspend the investigation, and
> notify other parties to the investigation and the Commission
> not less than 30 days before the date on which it suspends
> the investigation,
>
> (2)   provide a copy of the proposed agreement to the
> petitioner at the time of the notification, together with an
> explanation of how the agreement will be carried out and
> enforced, and of how the agreement will meet the
> requirements of subsections (b) and (d) or (c) and (d), and
>
> (3)   permit all interested parties described in section 1677(9)
> of this title to submit comments and information for the record

>       before the date on which notice of suspension of the
>       investigation is published under subsection (f)(1)(A).

19 U.S.C. § 1673c(e). There are no references to §§ 1516a(b)(2) or 1677f(a)(3) in the

text of § 1673c(e); instead, § 1673c(e) simply provides that Commerce must provide

notice and comment opportunities for all interested parties before issuing a notice of

suspension. Id. The Government nevertheless insists that the intent of § 1673c(e) was to

provide the sole "notice, comment, and consultation procedures" that Commerce must

follow in suspending an antidumping duty investigation (or, in this case, amending an

existing suspension agreement). See Def.'s Resp. at 18. Specifically, the Government

contends that Congress would not have included these notice and comment procedures

in a separate section applicable to suspension agreements if it did not also intend these

procedures to be mutually exclusive with the recordkeeping requirements of

§§ 1516a(b)(2) and 1677f(a)(3). Id.

As support, the Government relies on a short quotation from the Senate Report

that emphasizes the importance of Commerce's consultations with the petitioner prior to

adopting a suspension agreement. See id. at 15 ("the requirement that the petitioner be

consulted will not be met by pro forma communications. Complete disclosure and

discussion is required." (quoting S. Rep. 96-249, at 54, 71, 1979 U.S.C.C.A.N. at 440,

457)). The Government's reliance on this language is perplexing because, to the extent

that it is relevant at all, it suggests that Congress had no intention for suspension

agreement negotiations to bypass any statutory recordkeeping requirements. The

Government argues that "Congress['] emphas[is on] communications with the petitioner

in the congressional reports accompanying the legislation makes sense only if Commerce's suspension agreement negotiations are otherwise off-the-record." Id. However, the Government's reading of this language strains credulity, as it ignores conflicting language in the Senate Report as well as the broader context of the statutory provisions regarding suspension agreements.

Prior to the passage of the Trade Agreements Act of 1979, the international trade law statutes did not permit suspension of investigations. See S. Rep. 96-249, at 51, 71, 1979 U.S.C.C.A.N. at 437, 457. In enacting § 1673c, Congress emphasized that suspension agreements were intended only for "unusual" and "narrowly circumscribed" circumstances. Id. at 71. Given this broader context, the Senate Report's emphasis on the importance of Commerce guaranteeing "complete disclosure and discussion" with petitioners in the suspension agreement process can best be understood as providing additional protections to the domestic industry. Id. Rather than justifying off-the-record communications as the basis for structuring suspension agreements, the legislative history of § 1673c suggests that Congress aimed to ensure that Commerce would not abuse its newly granted power to suspend investigations or restrict interested parties' access to relevant information in connection with a proposed suspension agreement. The Government has not identified, nor has the court found, anything in the legislative history of § 1673c that suggests that suspension agreement negotiations were intended to be exempt from the generally applicable recordkeeping requirements of §§ 1516a(b)(2) and 1677f(a)(3).

The Government also relies on the history of Commerce's regulations, 19 C.F.R. §§ 351.208–.209, implementing § 1673c. <u>See</u> Def.'s Resp. at 23. Problematically, the Government's argument that "Commerce has long interpreted section 1673c(e) to mean that the negotiation of a suspension agreement is not subject to the record requirements of section 1516a(b)(2)," finds no support in the cited regulatory history. <u>See id.</u> (citing <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. 27,296, 27,312 (Dep't of Commerce May 19, 1997) (preamble to rulemaking adopting 19 C.F.R. §§ 351.208–.209)). That history fails to refer to § 1516a(b)(2) or otherwise corroborate the Government's position. <u>See</u> <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. 27,296, 27,312 (Dep't of Commerce May 19, 1997). Accordingly, the court does not agree that the language and legislative history of § 1673c(e), or its implementing regulations, support the Government's position.

The Government also misreads the statute when it argues that § 1673c(e)'s due process protections of notice and comment prior to a determination to suspend an antidumping investigation somehow conflict or render "superfluous" the recordkeeping requirements established in §§ 1516a(b)(2) and 1677f(a)(3). <u>See</u> Def.'s Resp. at 18. Section 1516a(b)(2), as described previously, defines the scope of the administrative record for the judicial review of antidumping duty proceedings. 19 U.S.C. § 1516a(b)(2). Included within the scope of the administrative record is a reference to § 1677f(a)(3), which requires that Commerce must maintain records of ex parte communications relating to antidumping duty proceedings. 19 U.S.C. § 1677f(a)(3). Taken together,

§§ 1516(a)(b)(2) and 1677f(a)(3) provide the generally applicable recordkeeping requirements for Commerce's antidumping duty proceedings.

Section 1673c, on the other hand, does not address general recordkeeping requirements, but rather focuses on Commerce's ability to suspend or terminate antidumping duty investigations. 19 U.S.C. § 1673c. Section 1673c(e) specifically provides that Commerce must afford notice and comment to petitioners and other interested parties before suspending an investigation. 19 U.S.C. § 1673c(e). These notice and comment requirements do not serve to replace the recordkeeping requirements generally established in § 1516a(b)(2). Instead, § 1673c(e) affords interested parties additional due process protections before Commerce may suspend an antidumping investigation. See S. Rep. 96-249, at 71, 1979 U.S.C.C.A.N. at 457. Accordingly, the court rejects the Government's attempt to frame § 1673c(e) as somehow incompatible with or mutually exclusive of the recordkeeping requirements applicable to all antidumping duty proceedings in §§ 1516a(b)(2) and 1677f(a)(3).

Additionally, the court rejects the Government's argument that suspension agreement proceedings under § 1673(c) are not governed by the record requirements of §§ 1516a(b)(2) and 1677f(a)(3) for two other reasons. First, 19 U.S.C. § 1516a(a)(2)(B) lists the reviewable determinations that may be contested before the U.S. Court of International Trade. Specifically, § 1516a(a)(2)(B)(iv) provides that an interested party may challenge a determination by Commerce "under section 1671c or 1673c of this title, to suspend an antidumping duty or a countervailing duty investigation, including any final determination resulting from a continued investigation which changes the size of the

dumping margin or net countervailable subsidy calculated, or the reasoning underlying such calculations, at the time the suspension agreement was concluded." 19 U.S.C. § 1516a(a)(2)(B)(iv). The plain language of § 1516a provides that Commerce's determinations involving suspension agreements are reviewable determinations, and the Government fails to point out any statutory language indicating Congressional intent to provide for different recordkeeping requirements for suspension agreement determinations as compared with any other reviewable determination listed under § 1516a(a).

Second, despite the Government's primary argument that suspension agreement proceedings are not governed by § 1677f(a)(3)'s recordkeeping requirements, the Government's actual recordkeeping conflicts with its claimed statutory interpretation. Commerce memorialized two ex parte meetings in this matter prior to the issuance of the final determination adopting the amendment to the AD Suspension Agreement: one regarding a meeting between representatives of Mexico and Secretary of Commerce Ross in March 2017, and another regarding a discussion between Commerce officials and representatives of the domestic sugar industry in the "Sugar Users Association" in June 2017. See Sugar From Mexico: Meeting with Secretary Wilbur Ross, PD 77 (Dep't of Commerce Apr. 4, 2017); Sugar from Mexico: Ex-parte Memo, PD 95 (Dep't of Commerce June 21, 2017). The Government insists that no "substantive discussion" of the suspension agreement amendments occurred at these two ex parte meetings. Therefore, the Government maintains that memorializing these meetings was not inconsistent with its position that suspension agreement proceedings fall outside the

scope of the recordkeeping requirements of §§ 1516a(b)(2) or 1677f(a)(3). See Def.'s

Resp. at 26–27. The Government emphasizes that these two ex parte meeting

memoranda do not "memorialize[] deliberative discussion in any manner that would

undermine an ongoing negotiation," and are thus distinct from the additional records

sought by CSC Sugar. Id. at 27. The Government's argument, however, ignores the plain

language requirement of § 1677f(a)(3), which applies to all ex parte communications

involving the provision of "factual information in connection with a proceeding" and

requires the memorialization of no more and no less than "the identity of the persons

present at the meeting, the date, time, and place of the meeting, and a summary of the

matters discussed or submitted." 19 U.S.C. § 1677f(a)(3). The statute does not

differentiate between substantive and non-substantive ex parte meetings.

Aside from their statutory interpretation arguments, the Government and

Defendant-Intervenors advance similar contentions that suspension agreement

negotiations are in some way inherently privileged or confidential and are thus exempt

from statutorily mandated recordkeeping and disclosure. See Def.'s Resp. at 19–20, 22–

26; ASC Resp. at 6–8 ("Any Communications Between Commerce and the Parties During

the Negotiations to Amend the Suspension Agreements are Privileged"); Cámara Resp.

at 6–8 (similarly suggesting that suspension agreement negotiations are akin to

confidential settlement agreement discussions, or alternatively, that these negotiations

are protected by the deliberative process privilege). Because Commerce failed to place

on the record memoranda for the ex parte communications at issue that included at least

the non-confidential information required by § 1677f(a) (i.e., a summary memorandum

listing the date, time, and participants to the communication, as well as a non-confidential summary of general matters discussed), the court cannot reach the question of whether any specific content is protected from disclosure as confidential or privileged. See 19 U.S.C. § 1677f(a)(3). Both the statute, as well as Commerce's regulation defining the official record for review for determinations challenged before this Court, are clear: the record includes "all information presented to or obtained by" the agency, including confidential and privileged material. See 19 U.S.C. § 1516a(b)(2); 19 C.F.R. § 351.104(a) ("The official record will include government memoranda pertaining to the proceeding, memoranda of ex parte meetings, determinations, notices published in the Federal Register, and transcripts of hearings. The official record will contain material that is public, business proprietary, privileged, and classified.").

Accordingly, once the Government has filed the requisite non-confidential information required by §§ 1516a(b)(2) and 1677f(a)(3), as part of the administrative record in this action, it may seek protection for any substantive confidential and privileged information that may otherwise be required for disclosure by those statutory provisions. See 19 U.S.C. § 1516a(b)(2)(B) (stating that privileged or confidential information may retain the appropriate protections from disclosure, and that the court "may examine, in camera, the confidential or privileged material, and may disclose such material under such terms and conditions as it may order."); Pl.'s Reply at 11 ("to the extent that confidentiality, as opposed to privilege, is the issue, information may be released under an administrative protective order to counsel to protect confidentiality"); see also USX Corp. v. United States, 11 CIT 419, 664 F. Supp. 519 (1987) (analyzing

government's claim of deliberative process privilege after government conceded that documents should be on the record but protected from public disclosure under § 1516a(b)(2)); Star-Kist Foods, Inc. v. United States, 8 CIT 305, 600 F. Supp. 212 (1984) (discussing the court's authority to order disclosure of confidential documents under § 1516a(b)(2) and analyzing the assertion of privilege after the Government had added public and confidential versions of the contested documents to the record). In asserting privilege claims the Government carries the burden of proof and must provide a specific basis for claiming privilege applies. See United States v. Greenlight Organic, Inc., 41 CIT ___, ___, 279 F. Supp. 3d 1317, 1320 (2017) ("In order to invoke executive privilege, the party claiming it must (1) make a formal claim of privilege via the head of the agency or his delegate, (2) submit an affidavit showing 'actual personal consideration by that official,' and (3) provide a detailed explanation of what the document is and why it falls within the scope of the privilege." (citing Landry v. F.D.I.C., 204 F.3d 1125, 1135 (D.C. Cir. 2000)).[5]

As a final note, the court observes that in addition to requesting an order requiring Commerce to memorialize and include in the record memoranda regarding ex parte

---

[5] The court notes that although Defendant-Intervenors suggest that some form of privilege may protect the information at issue in Plaintiff's motion, the Government has failed to identify or assert any particular claim of privilege. See generally Def.'s Resp. Without further comment, the court also observes that in Baker & Hostetler LLP v. Dep't of Commerce, 473 F.3d 312 (D.C. Cir 2006), a case cited favorably by the Government in its response brief, Commerce took the express position that the record requirement of § 1677f(a)(3) is a "public record" that would not be limited by § 1516a(b)(2)(B)'s preservation of otherwise confidential or privileged materials. See Baker & Hostetler LLP, 473 F.3d at 322 (quoting the Commerce Department's brief).

communications in Commerce's negotiation of the AD Amendment during April and May 2017, CSC Sugar also requests that the court direct Commerce to add to the record ex parte memoranda published <u>after</u> Commerce's final determination adopting the AD Amendment. <u>See</u> Pl.'s Br. at 8. The court rejects Plaintiff's suggestion that the record should include any ex parte memoranda created after the challenged final determination that was published on July 11, 2017. <u>See</u> <u>Torrington Co. v. United States</u>, 16 CIT 76, 77-78, 786 F. Supp. 1027, 1029 (1992) ("Any information received by Commerce after the particular determination at issue is not part of the reviewable administrative record." (citing <u>Ipsco, Inc. v. United States</u>, 13 CIT 489, 494, 715 F. Supp. 1104, 1109 (1989))).

### IV. Conclusion

Accordingly, it is hereby

**ORDERED** that CSC Sugar's motion to complete the administrative record is granted in part and denied in part; it is further

**ORDERED** that Commerce shall supplement the administrative record on or before July 11, 2018 by filing with the court the record of any ex parte meetings about the AD Amendment; and it is further

**ORDERED** that the parties shall file a proposed scheduling order governing further proceedings in this action on or before July 18, 2018.


                                                    /s/ Leo M. Gordon
                                                  Judge Leo M. Gordon


Dated:  June 1, 2018
          New York, New York