# SWEETENER USERS ASSOCIATION

ONE MASSACHUSETTS AVE. NW • SUITE 800 • WASHINGTON, DC 20001 • (202) 842-2345 • (202) 408-7763 FAX

June 9, 2016

The Honorable Penny Pritzker
Secretary
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230

The Honorable Tom Vilsack
Secretary
U.S. Department of Agriculture
1400 Independence Avenue, SW
Washington, DC 20250

Dear Secretary Pritzker & Secretary Vilsack:

Since we are hearing reports of a potential renegotiation of the sugar suspension agreements with Mexico, we are submitting the following comments on behalf of the Sweetener Users Association (SUA), a coalition of companies that utilize nutritive sweeteners in their business operations, as well as the trade associations to which these companies belong.

### U.S.-Mexico Suspension Agreements:
### Critical Issues in Any Renegotiation

Although portrayed as a way to settle disputes over imports of Mexican sugar and avoid future market disruptions, the antidumping and countervailing duty suspension agreements between the U.S. and Mexico have, in fact, themselves been highly disruptive. The agreements have –

- Arbitrarily increased domestic prices beyond the level justified by market fundamentals;
- Enshrined a historically low level of ending stocks as a policy target, thereby encouraging inadequate sugar supplies; and
- Through an attempt to manage the mix of raw and refined sugar in the U.S. market, artificially reduced supplies of raw sugar available to U.S. cane refiners, causing that industry to operate at sub-optimal capacity utilization.

A great irony of the suspension agreements' operation is that they have restricted supplies of raw cane sugar to U.S. refiners at a time when the demand for cane sugar has been increasing significantly, and demand for beet sugar decreasing, in the U.S. market. This differential demand growth reflects the increasing popularity of so-called "non-GMO" products. Since cane sugar is not bioengineered while virtually all beet sugar is, the move by some food manufacturers to avoid bioengineered products is leading to a stronger demand for cane sugar in the U.S. market at the very time that the suspension agreements create artificial incentives for Mexico to export its sugar in refined rather than raw form, bypassing U.S. refiners. This perverse *incentive* is the result of the agreements' permitting up to 53% of such exports to be refined sugar, and

their establishment of a higher reference price for refined sugar that incentivizes Mexican exporters to ship as much as possible in that category.

The reference prices themselves are, however, the greatest single problem in the agreement. As recently as the 2014 Farm Bill, Congress voted to extend current price support rates (18.75 cents per pound for raw cane sugar and 24.09 cents per pound for refined beet sugar) through 2018. Yet by stipulating that the single largest source of sugar imports must be priced – at the plant of origin, not delivered – at prices much higher than U.S. loan rates, the suspension agreements virtually guarantee that domestic prices must always trade well above the levels determined by Congress through the legislative process not long before the suspension agreements were implemented. The suspension agreements constitute a stealth price support increase of nearly 20% and give U.S. sugar processors and producers a huge windfall that they could never have gotten from Congress.

The table on the next page presents changes recommended by SUA in the event of a renegotiation of agreements between the United States and Mexico, which led to the suspension of antidumping ("AD") and countervailing duty ("CVD") investigations in December 2014. The table explains the major problems with the current agreements, recommends specific changes to the applicable agreement, explains the proposed changes and states a rationale for making the changes.

The agreements are referred to as either AD or CVD, along with the relevant section (e.g., CVD.V.B.4 means the Agreement Suspending the Countervailing Duty Investigation on Sugar from Mexico, Section V, paragraph B, subparagraph 4).

| Issue | Problem in Current Agreements | Proposed Change | Description | Rationale |
|---|---|---|---|---|
| Reference Prices | -Reference prices in AD Appendix I are excessive, especially on an FOB basis. -Prices constitute a *de facto* loan rate increase for both cane and beet sugar. -The inadequate spread between refined and "other" reference prices increases U.S. refiner feedstock costs, compressing margins. | In AD Appendix I, strike "$0.2600" and insert "$0.2409"; and strike "$0.2225" and insert "$0.1875". | -Replaces current reference prices for refined and other sugar with U.S. loan rates for refined and raw sugar, respectively. | -Congress could have increased U.S. loan rates but did not; neither should the agreements. -The amendment would restore the implicit refining margin contained in U.S. sugar policy. -Higher transport costs from Mexico to the U.S., compared to domestic costs, should ensure that U.S. domestic market prices will always remain above forfeiture levels. |

2

| Stocks-to-Use (S/U) Target | -The 13.5% S/U target in CVD II.R. creates a presumption of excessively tight supplies. <br> -13.5% is the very lowest point in USDA's historic target range, meaning it verges on inadequacy. <br> -In practice, the use of a low S/U has exacerbated the problems of U.S. cane refineries in obtaining adequate raw sugar. | In CVD II.R., strike "1.135" and insert "1.155". | -Substitutes a 15.5% S/U, equal to current (May 2016) projections of supplies after USDA's TRQ increase and additional Mexican access. | -Provides additional access to Mexico. <br> -Should be consistent with greater flows of raw sugar to refiners. |
|---|---|---|---|---|
| Raw-Refined Mix | -Refined sugar may be up to 53% of Mexico's exports. <br> -The Agreement's incentives to ship refined sugar (including the high reference price) create risks of inadequate raw sugar supplies for U.S. cane refiners. | In CVD V.C.3., strike "53" and insert "35". | -Provides for 65-35 mix of "other" and refined sugar. | -Encourages adequate supplies to cane refineries. <br> -Consistent with USDA aims in May 2016 grant of additional access to Mexico, where the excess over previous amount is restricted to lower polarity. |
| **Clarification:** U.S. Authority to Increase WTO TRQ | -Some in Mexico assert that CVD V.B.4 requires all additional sugar to come from Mexico. <br> -Though this assertion is incorrect, it could complicate U.S. import policy going forward if not clarified. <br> -In fact, the agreements make no change to U.S. TRQ authority, which is based on the HTSUS. | CVD V.B.4. Add at the end: "Nothing in this Agreement limits, constrains or restricts the ability of the United States to increase the tariff rate quotas established pursuant to the Additional U.S. Notes to Chapter 17 of the Harmonized Tariff Schedules of the United States." | -Clarifies that the reference in the preceding sentence to "additional need for Sugar from Mexico" refers, by its plain language, to a need for sugar *from Mexico*, not from the world market, and does not limit U.S. authority under longstanding law to increase TRQs. | -The U.S. never agreed to make Mexico the source of *all* its import needs beyond the WTO minimum TRQ. <br> -Adopting the view of some in Mexico could expose the U.S. to trade complaints from as many as 39 quota-holding countries. <br> -The U.S. showed its (correct) view of the Agreement through the May 2016 TRQ increase, and this simple clarification would avoid any future controversy. |

SUA believes it is in the public interest for both the Department of Commerce and the Department of Agriculture to hear how these suspension agreements are affecting the U.S. sugar-using sector. We hope that you will give serious consideration to the options we have outlined in this letter. It is critical that we limit any collateral harm caused by any suspension agreements to this valuable sector of the U.S. economy that provides so many American jobs.

Sincerely,

Richard Pasco
President